25-6061. Yes, Your Honor. Thank you. Thank you, members of the court. My name is Mark Hammonds. I represent Juan Dominguez, who is the appellant in this case. Mr. Dominguez was fired after participating in an internal investigation into discrimination in which he reported his supervisor, Mr. Yates, was engaging in gender-based discrimination. favoritism towards females. The court found against us, claiming that we had not established sufficient knowledge to sustain the third prong of the retaliation case. Now, it was undisputed in this case that both the putative decision-maker, Mr. Strickland, and the person we claimed to be the instigator of this, Mr. Yates, knew that Mr. Dominguez had participated in a discrimination investigation. Not gender discrimination, though, right? Pardon me? Not gender discrimination. The basis for the Mr. Yates said, I know, Mr. Dominguez, you've initiated this. I know it's about me favoring women, and I know that or suspect that you're going to report me for that. Now, I said that before Mr. Dominguez had done any of those things. I'm sorry, when did Yates say, you're saying Yates said these things? Yes, Yates said those things. Yates is the supervisor. And he said it to whom? He said it to my client, Mr. Dominguez. But the issue is whether Mr. Strickland knew that, and the record is that he did not know about the gender discrimination allegation. Yes, that is the testimony. And he's the decision-maker for the determination, so how do you get around that? Well, the Catspaw Doctrine, Your Honor, which we raised and fully briefed in that case, all of the basis for determination, everything that Mr. Strickland said was the reason, was information given to him by Mr. Yates. There was no investigation of Mr. Yates' allegations. One of them, the court found the evidence was so lacking that he determined on summary judgment that there had been no instruction for Mr. Dominguez to appear at a June 13th training exercise, which Mr. Strickland said, at least at one point, was the straw that broke the camel's back, causing him to be terminated. There is no prior record of discipline, infractions, failures of performance, anything on the part of Mr. Dominguez. Wasn't there a whole series of things that Mr. Dominguez did, didn't come to meetings, didn't do payroll, didn't do the training, just one thing after another? Well, that's what was claimed, Your Honor. There were no contemporaneous admissible records to show that those that happened, it was undisputed that no one had talked to Mr. Dominguez or claimed any of those things prior to the date of his termination. His disciplinary and performance record was completely clean up to that point in time. There were records that were excluded by the court properly on a hearsay ground, but even if they were considered, they were created after Mr. Yates became aware that an investigation was going to take place, one that he blamed Mr. Dominguez for, and one where he correctly predicted that Mr. Dominguez would raise an issue of gender discrimination. So, I want to make sure I understand your statement that Yates said certain things to Dominguez about gender discrimination. Yes. There was a conversation, as I understand it, where Yates told your client that they had to get aligned and had to start working together because if they weren't going to work together, it was going to be either your client's job or Yates's job. That's correct. Is that what you're referring to when you say Yates told Dominguez that he knew Dominguez was complaining about gender discrimination? No, there's more direct complaint, which we quoted and the court discounted. Mr. Yates said, I've got a problem with women. I know I've got a problem with women. I know or think that's the basis for the investigation. It was not. It was a race complaint. He was wrong about that. And he said, I don't know if I'm going to quote this exactly right, but I know that you are the source of this investigation about gender discrimination by me. He said all of those things with, actually, it appears within a span of a couple of weeks before the investigation was actually commenced. What the court said about that in its order is that most of Dominguez's cited evidence pertains to events that occurred before the plaintiff made his report on June the 10th. Necessarily, this evidence cannot demonstrate that Mr. Yates harbored a discriminatory animus on the basis of plaintiff's yet unmade gender discrimination claim. In other words, he said, if you haven't done it at the time, I'm not going to consider what Mr. Yates said was his motivation and his belief. Now, respectfully, Your Honor, I have not found any case where it has not been accepted that a person's beliefs are evidence of their motive, and motive is evidence of causation. The court did not cite any case that would support such a finding. The defendant didn't cite any case. But you're saying that Yates, I missed this, I think, you're saying that Yates said, they're investigating gender discrimination. No. Well, yes. He thinks, Yates says, I'm being investigated, I think it's gender discrimination. And he says to Dominguez, and I think you're the one who's responsible for this. Yes. And that's in the record. There is no contrary evidence to the record, because Mr. Yates was not capable of being deposed by either party. And that exchange was presented to the district court. It wasn't just in the record, it was part of the argument. It was part of the argument, Your Honor, and it's part of the argument that the court addressed. He acknowledged those statements, he acknowledged that evidence, but it said it didn't matter because it happened before Mr. Dominguez actually appeared and gave his evidence. We argued specifically that a person's belief is sufficient on that issue. Now, I will tell you, I haven't found a Tenth Circuit case that says belief is the equivalent of knowledge. But the Supreme Court has said, essentially, that belief is the equivalent of knowledge in the Heffernan case, which we cited to the court. I will say the court found our argument undeveloped, even though we plainly said belief is sufficient to establish the knowledge component. And we cited Heffernan, summarized that it said even a mistaken belief will support a retaliation claim, and cited Wrights v. Hoye-Schuh, which said, and we did that for the common sense quotation it had, and that is we know that employers make their decisions as much based on what they believe as on what they know. Now, I don't think that's underdeveloped. I will tell the court I have not found a case of this circuit giving a right-line example of what's sufficient. But, and although it's not precedent, the court's manual for attorneys in briefings suggests that two good cases with appropriate page citations, an appropriate quotation, and appropriate summary is usually considered a good and sufficient argument. And the court said in the practitioner's guide a series of string cites was not particularly helpful. Can you really kind of circle back in a very short and concise way, one or two sentences, say why there's a fat question on the cat's paw theory? I'm sorry, what? On the cat's paw theory? On the cat's paw. Well, the courts acknowledged that two of the prongs were... Tell me very concisely, like if you were telling a jury the cat's paw theory, A, B, C, D, therefore, cat's paw. Mr. Yates believed that our client was the source of an investigation against him in which our client was going to raise issues that he acknowledged he had a problem with, gender. The only source of the information giving rise to the client's termination was the information that Mr. Yates supplied to Mr. Strickland. There was no intervening investigation, which is not automatically a breach in the chain under STOM. And the only reason for the termination was the information given to Mr. Strickland by Mr. Yates. That is all of the elements required to establish at least a jury question on cat's paw. And the only reason... Mr. Strickland never did any investigation of his own. The only time he talked to the plaintiff was the morning that he fired him. And he didn't ask him to verify or address the results. If he'd done any kind of investigation, there were two people who were supposedly instructed to appear at this June 13th training session. Neither of them, my client was one, but the other one also said, I wasn't notified about that and he didn't attend, was not disciplined in any manner for his not attendance. So it would have been easy to conduct an investigation. Mr. Strickland did not do that, despite the fact that there's no record of any performance issue or disciplinary problem prior to the termination on June 19th, I believe was the date of that. So the reason why the court did not credit the cat's paw doctrine was one only. It said you can't show that Mr. Yates was motivated by animosity based on retaliation. Because there had been nothing to retaliate against at the time he made the statements saying essentially I'm going to retaliate against you. I guess if he appeared and testified for the investigation. I think a jury could fairly infer that he simply predicted what he thought was going on, part of which was correct. And then acted upon that. Now he may not have known the words that were said during the investigation, but they knew that there is an event that is a protected event, participating in an investigation into discrimination. They knew both the decision maker and Mr. Yates knew that my client had participated in that, had given evidence in that case. The only thing that they didn't know were the exact words that he said during the investigation. And the Tenth Circuit, to my research, has never said that degree of knowledge is required to establish the third prong of causation in a retaliation case. There are some courts that have expressly said that a suspicion is enough to give rise to protection to satisfy that third prong. Our court has neither accepted nor rejected that proposition. But I would suggest that that's a common sense proposition that would have to be followed in light of the Heffernan decisions and the decisions of this court, which have followed since that in the Byrd case and in the Avand case, where you've recognized that person doesn't have to even make a protected statement if the other person thinks that that's what they're doing. And of course, even preceding that in the Sowers case. Can you remind me, Yates was not deposed, right? Pardon me? Yates was not deposed? Yates was not anywhere inside when the trial was going on. And so what's the basis of your statement that Yates could have predicted that Dominguez had told about the gender discrimination to Ms. Sutherland? Because he said that to Dominguez. He said to Dominguez, I know I've got a complaint with women. I know you've raised that issue before. I know that you're the one initiating this investigation. He's wrong about that, of course. But in his mind, he knew that was the case. And those came from his lips. They were admissible, not challenged as being inadmissible. Well, Yates was being investigated for racial discrimination, wasn't he? Yes. But not gender discrimination? The genesis of the investigation was not race. Yates thought it was gender. He did not know it was race. He thought my client would report gender discrimination. He was right about that. His prediction was correct. My client did report that. I'll reserve my 10 seconds, I guess. Thank you, counsel. Thank you. Mr. Watley? Did I pronounce your name correctly? Yes, you did. Thank you. May it please the court? My name is Nathan Watley. I represent the Defendant Appellee, Wider Security Services. In this matter, and I do want to go back to some of the questions that the court had and some of the statements that were made by counsel for the appellant. And I've got some concern about what he's trying to say there. He came forward and said that Mr. Yates said to the plaintiff that, I know you initiated this. I know you're going to report me for gender discrimination, and that we need to get aligned. He tried to tie all that together into one conversation. And he made that same attempt in the underlying case, and the court found, called him out for it. He found, the judge found in his initial order granting summary judgment, footnote 24, which is on page 25 of the order in the appendix, page 490. Again, here, the plaintiff claims that Yates told him, I know you complained to me about Robert and Mike, and we better get aligned. It was going to be my job or his. And the court said, this is a glaring mischaracterization of the record. Plaintiff cobbles together part of his deposition testimony with the question from his counsel posed 35 pages later to make it appear as if Mr. Yates' comments about getting aligned were tied to plaintiff's earlier complaints to Mr. Strickland and another gentleman at Weiser about gender discrimination. Aside from the timing of these events, did Mr. Dominguez testify that Yates said to him, I think I'm going to be, there's an investigation against me, I think it's going to be based on gender, and I think you started, or words to that effect? No, Your Honor, that didn't happen at all. That was not his testimony. He testified that there was an earlier situation. Okay, what was the earlier situation? It was one investigated by Mr. Bullock and Mr. Strickland that didn't involve Mr. Culberson at all. It wasn't being investigated by the HR team. It came previously, and there had been some complaining about that. What sort of complaint? It did involve favoritism allegations toward women. But it was previous in time, and it wasn't tied to the investigation that was going on in June. How long before the June investigation? Your Honor, I want to say a matter of a couple of months. It may have been longer than that. But it was definitely. So why is it so outrageous then to say, well, speaking. Thank you. I'm going to get a hunchback doing this, but I'll try to talk into the mic. Why is it so outrageous to infer the following? That Yates suspected Dominguez of complaining about Yates for gender discrimination, discriminating against men, favoritism toward women, and saying, I know you're the person who initiated the investigation. And then a couple months later, during the investigation, he is investigated for gender discrimination, and he now thinks that Dominguez has complained about him to the investigator, and therefore, why is that not a reasonable syllogism there? Well, Your Honor, a couple of different things there. He didn't say that he thought that Yates did not say that he thought that Plaintiff had initiated the investigation that was happening in June. He said, I know you had complained about me to the other individuals, and that part of what his complaints were was favoritism. It wasn't really couched in terms of a gender discrimination complaint. It wasn't taken to HR in the same way that the one in June was taken with Mr. Culberson's race discrimination. The one that was taken to HR, there was no component of gender discrimination in it? That's correct. None. It was none. It was purely a race discrimination claim brought by Mr. Culberson. And also it's important because, again, they're trying to tie two conversations together and make it sound as if on the very eve of going in for his interview. Two months earlier is not an unreasonable amount of time to harbor resentment and suspicion of someone. But he said nothing to indicate that he thought that Dominguez had complained about favoritism toward women? Did he not? He didn't say something to Dominguez about, I know you think I'm playing favorites? No, not in the context of the upcoming HR investigation. At any time? Not in those words, no, Your Honor. All he allegedly said was, I know you complained about me to Mike Strickland and to Mr. Bullock. Again, it was not in the context of an HR complaint. And was there any indication of what the complaint's substance was, whether it was about race or whether it was about gender? There were a number of things that he was complaining about in terms of management style, giving people breaks and things of that nature. Did what Yates say indicate what he thought Dominguez had said negatively about him? No, Your Honor. All he said was you had complained about me to Mike and to Mr. Bullock. Again, this was a separate conversation. Later, the conversation about getting aligned, which plaintiffs have tried to return to again and again and use to say that there was some connection, didn't have that connection. You have to keep in mind that that conversation occurred before Mr. Yates even knew there was going to be an investigation in June. He hadn't been told that there was a complaint or that HR was coming to investigate. It was allegedly two days before he would have ever even learned that any kind of investigation was going on. Again, there's just not that connection between a general statement of we need to get aligned and we need to work together or else one of us is going to be gone and then trying to bootstrap that into somehow he's predicting in advance that there's going to be a complaint in a few days by someone else that Mr. Dominguez will testify in that and that he'll raise something completely unrelated to the underlying complaint. There's just no evidence tying all those together and this suggestion that plaintiff keeps making that it was all part of one conversation or that there was even a conversation where he said you initiated this is just not accurate. It's not in the record. With regard to the cat's paw theory that there was some discussion about, plaintiff is maintaining now that everything that Mr. Strickland gave as a reason for the termination of Mr. Dominguez was provided by Mr. Yates. Again, that's completely not accurate. In addition to, he had gotten complaints about Mr. Dominguez from Mr. Yates with regard to performance and failing to perform. But also, much more importantly, he had gotten complaints from Chip Ford who was the client representative for Halliburton and who was responsible for deciding whether or not Weiser got to stay there and keep... But Ford was complaining that the training for COVID was inadequate. That was one of the things, Your Honor. He wasn't complaining specifically about Mr. Dominguez, was he? Well, in the sense, yes and yes. Because Mr. Dominguez was supposed to do the training and he didn't follow the script. But Ford didn't know that. He just knew that the training wasn't adequate. Correct, but Mr. Strickland knew who did it. Well, how did he know? He knew it from Yates, right? I think he may have known it independently because it was a big deal. Halliburton was really, really keen on getting this rolled out. They were hyper-vigilant at that time about everyone being trained in a very particular way. They wanted it to be carried out according to the script. Yeah, but Mr. Dominguez's excuse was he was... Yates had not told him to show up the next day, that he had interfered with him and asked him to do something else. And Strickland never heard that. Strickland never, I mean, this guy's fired without having an opportunity to present anything to the person firing him. Is that fair to say? I think he had a chance to discuss with him what was going on at the time. But the decision had been made, Your Honor. But certainly, there are additional points, too, that Mr. Ford raised having to do with Mr. directly having to do with Mr. Dominguez's behavior with regard to reporting his own COVID symptoms, going into the very small guard station while he had COVID symptoms, not wearing... That came from Yates. No, sir, that came directly from Chip Ford to Mr. Strickland. Because Chip Ford could see it on video, and he knew... That Dominguez had not said, had not worn a mask, and did not report that he was going to be tested for COVID. Correct, and that he had gone into the guard station in a very enclosed area where they didn't want multiple people. On top of that, while he had COVID symptoms. So those things were reported directly to Mr. Strickland and Mr. Ford. It just seems to me a little suspicious that someone who, less than a year earlier, had been the only one named as Employee of the Year, is then fired without being called in to explain himself and see if there was any excuse he had. That strikes me as peculiar conduct. I think the preponderance of all the things that Mr. Strickland was seeing led him to that conclusion that he needed to make a change. Yeah, but he concluded that without hearing if there were any excuses or any other side to the story. Your Honor, I understand your point. However, that really doesn't go to the issues that are in front of the court on this, because we're talking about the prima facie case, not whether it was pretextual, that they had a good reason to terminate. Pretext can be considered in determining whether there's a prima facie case. In very rare cases, though, Your Honor. Yes, but it can be. I mean, it's relevant. Not usually. It's not usually relevant. Not usually. Nor it has to be something that goes to prove that element of the prima facie case. And here it does not. The fact that they may have done something that seems unfair, we may agree that that's not the best way to handle the termination. We all could agree to that, perhaps. You're making a good case against McDonnell Douglas. Thank you. But that's the case, Your Honor. And I think we have to live with that. And this court has recognized that and has to live with it. You've got to get through that prima facie case first. I'll just tell you. I wrote the Wells case way back. And the thing that I spent more time on than anything was, can we consider what was clearly pretextual in determining whether there's a prima facie case? And there was some authority out there, and that was the deciding feature in that case. The fact that there was a pretextual reason for firing got the plaintiff through the prima facie case requirement. But there, I think, Your Honor, that case didn't involve whether or not someone knew about a report of or a protected activity or had knowledge of it. That wasn't the issue there, yeah. Right. And so there, there was the opportunity for that issue that would normally be pretext to go through and help establish an element of the prima facie case. That's not the case here because that has nothing to do with whether or not they had knowledge. And there's nothing to show that either of the individuals, Mr. Yates or Mr. Strickland, knew what was reported or said by Mr. Yates in that meeting. The plaintiff talked about, you know, that Mr. Yates could have predicted maybe what he would say in an investigation, but he would have had to have predicted what the complaint was about, which it wasn't about gender, and then would have to have predicted some other things. But there's no evidence that he did. There's no record evidence to show that he ever made a comment or did anything to show that he believed there had been some sort of complaint against him by Mr. Dominguez in that June 10th interview. And that's what the claim in this case is. The claim is not that Mr. Dominguez was fired because he participated in someone else's complaint as a witness on an internal investigation. The claim that you can see in all the briefs is that he was terminated for reporting alleged sexual harassment and gender discrimination as part of that. And nobody that was part of that decision-making chain knew that at the time. Can you comment on this knowledge-belief dichotomy that counsel was talking about? Certainly, Your Honor. If you look at the cases that he cited, a lot of those have to do with mistaken belief as opposed to, or they have to do with the preemptive retaliation situation. And that's not what we have here. He's finally admitted in the briefing on appeal that they don't have a preemptive retaliation claim. And it's not a mistaken-belief case. They didn't have a belief one way or the other about what he said inside that meeting. They didn't have knowledge of it. So to the extent that those cases are being relied upon, they're not applicable. Also, there's just no evidence, Your Honor, to show that he had that belief and that he was acting on it to either intercept or to retaliate for that purpose.  The record that's in front of the court simply doesn't show what Yates believed. As was noted before, he wasn't deposed in the case. And there's not any record evidence of any kind of alleged statements by Mr. Yates relating to what he thought happened during the investigation. Thank you, Your Honor. Thank you. Any questions, Judge Kelly? No, thank you. Thank you, counsel.  Yeah, you've got 10 seconds, okay. I'm going to direct the court's attention to page 28 of the opening brief and the quotation from the deposition. Now, did Mr. Yates express to you in the weeks prior to June 10th interviews that he knew that complaints about gender treatment had been made against him? Answer yes. You indicated you were at a conversation where he admitted he had a problem and treated women better than men. Answer yes. Was that conversation one that occurred within the time period shortly before the interviews? Yes. Okay, in connection with that conversation, did he tell you that he knew he was going to be investigated for that? And the answer was yes. Thank you.  Well, I'm still going to thank both of you. Case is submitted. Counsel are excused.